LAW ANGELS PLLC
2162 East Williams Field Road, Suite 111
Gilbert, Arizona 85295
Telephone:  844.843.2643
Fax:  602.613.2738
E-service Distribution: docketing@angellawgroup.com
John A. Griffiths, 021103
Email: john@lawangels.com
Justin C. Johanson, 033329
Email: justin@lawangels.com

*Attorneys for Plaintiffs Mackenzie Padilla and S.S.P., a minor, by and through his mother and next friend, Mackenzie Padilla*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **MACKENZIE PADILLA**, individually and as Next Friend of **S.S.P.**, a minor,<br><br>Plaintiffs,<br><br>v.<br><br>**OFFICER CARRI SHAYNE CARRICO**, Badge #5872, in her individual capacity; **CITY OF BUCKEYE**, a municipal corporation,<br><br>Defendants. | **Case No.: 2:26-cv-04597-SHD-MTM**<br><br>**REDACTED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**Honorable Sharad H. Desai** |

## **COMPLAINT**

Plaintiffs Mackenzie Padilla ("Plaintiff" or "Ms. Padilla"), individually and as next friend of her minor child, S.S.P. ("Minor Plaintiff"), by and through their undersigned counsel, hereby bring this Complaint against Defendants Officer Carri Shayne Carrico ("Officer Carrico" or "Defendant Carrico") and City of Buckeye ("the City"), and allege as follows:

1

**PRELIMINARY STATEMENT**

1.      This is an action for damages and injunctive relief arising from the brutal assault and constitutional violations inflicted upon Plaintiff, a twenty-one-year-old African American woman who was approximately nine months pregnant, by Defendant Officer Carri Shayne Carrico of the Buckeye Police Department on November 1, 2025.

2.      While handcuffed, compliant, and visibly in the final weeks of pregnancy, Plaintiff was subjected to an unlawful and invasive search of her bare pregnant abdomen, racially derogatory comments, deliberate indifference to her safety during transport, and a violent physical assault inside the police booking facility—*including being struck in the head by Officer Carrico*—which caused a visible head contusion and dangerously elevated blood pressure requiring emergency medical treatment.

3.      Following this assault, the City of Buckeye and BPD failed to suspend, reassign, or otherwise restrict Officer Carrico from active patrol duties. Despite sustained findings of excessive force, falsification of records, and unprofessional conduct, the City imposed only verbal counseling and permitted Officer Carrico to remain on full active duty with unrestricted public contact. As a direct result of this deliberate indifference, Officer Carrico went on to assault yet another arrestee on January 25, 2026—less than three months after the attack on Plaintiff—prompting a separate criminal investigation by the Maricopa County Sheriff's Office. The City's pattern of tolerating and enabling Officer Carrico's violent conduct demonstrates deliberate indifference to the constitutional rights of citizens.

4.      Plaintiff served a Notice of Claim upon the City of Buckeye and the Buckeye Police Department on April 29, 2026, pursuant to A.R.S. § 12-821.01. The statutory sixty-day response period has expired without resolution.

**PARTIES**

5.      Plaintiff Mackenzie Padilla is a twenty-one-year-old African American female who, at all times relevant herein, was a resident of Buckeye, Maricopa County, Arizona 85326. At the time of the events described herein, Plaintiff was approximately thirty-seven weeks pregnant with her son, Minor Plaintiff S.S.P.. Ms. Padilla brings this action individually and as next friend of the Minor Plaintiff pursuant to Federal Rule of Civil Procedure 17(c). Ms. Padilla is the natural and custodial parent of the Minor Plaintiff.

6.      Minor Plaintiff S.S.P. is a minor child, born on November 22, 2025, twenty-one days after the events described herein. At the time of the assault upon his mother, the Minor Plaintiff was in utero at approximately thirty-seven weeks gestation. The Minor Plaintiff brings claims for prenatal injuries sustained as a direct and proximate result of Defendants' tortious conduct through his

2

mother, Mackenzie Padilla, as his next friend. The Minor Plaintiff's claims are limited to Arizona state-law causes of action, as set forth herein.

7.      Defendant Officer Carri Shayne Carrico ("Officer Carrico"), Badge #5872, is and was at all times relevant herein a sworn peace officer employed by the Buckeye Police Department. Officer Carrico was hired on or about September 18, 2023, and had approximately two years of experience at the time of the events described herein. Officer Carrico is sued in her *individual capacity* for her personal actions under color of state law.

8.      Defendant City of Buckeye ("the City") is a municipal corporation duly organized and existing under the laws of the State of Arizona. The City is responsible for the operation, supervision, policies, customs, and practices of the Buckeye Police Department and its sworn officers. The City is a proper defendant under 42 U.S.C. § 1983 and is subject to suit under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

9.      The Buckeye Police Department ("BPD") is a law enforcement agency and department of the City of Buckeye responsible for providing police services to the residents of Buckeye, Arizona. BPD is responsible for the hiring, training, supervision, discipline, and retention of its sworn officers, including Defendant Carrico. As a department of the City, BPD's policies, customs, and practices are attributable to the City for purposes of municipal liability.

10.     At all times relevant herein, Defendant Officer Carrico acted under color of state law within the meaning of 42 U.S.C. § 1983, and within the course and scope of her employment with the Buckeye Police Department.

## JURISDICTION AND VENUE

11.     This Court has original subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) and (4), which confer jurisdiction over civil actions to redress the deprivation, under color of state law, of rights, privileges, or immunities secured by the Constitution and by Acts of Congress providing for equal rights.

12.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims arise from the same case or controversy as the federal claims, share a common nucleus of operative fact, and are so related to the federal claims that they form part of the same Article III case or controversy.

13.     This Court is authorized to award damages, injunctive relief, and other appropriate relief pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Buckeye, Arizona, which is

3

located within the District of Arizona. Venue is also proper under 28 U.S.C. § 1391(b)(1) because all Defendants reside in this District.

15.     Plaintiffs have complied with the notice of claim requirements of A.R.S. § 12-821.01 by serving a Notice of Claim upon the City of Buckeye and the Buckeye Police Department on April 29, 2026. More than sixty (60) days have elapsed since service of the Notice of Claim without resolution. Compliance with A.R.S. § 12-821.01 is a prerequisite to filing suit against a public entity or public employee in Arizona, including in federal court.

16.     This action is timely filed within the applicable statutes of limitations. The limitations period for § 1983 claims in Arizona is two years, as borrowed from A.R.S. § 12-542. The limitations period for state tort claims against public entities is one year under A.R.S. § 12-821. The incident occurred on November 1, 2025, and this complaint is filed well within all applicable limitations periods.

## FACTUAL ALLEGATIONS

### A. The Traffic Stop and Unlawful Search

17.     On November 1, 2025, at approximately 2121 hours, Officer Carrico conducted a traffic stop of Plaintiff's vehicle in or near Buckeye, Arizona, for an alleged speeding violation of approximately 66 miles per hour in a 45-mile-per-hour zone.

18.     At the time of the traffic stop, Plaintiff was visibly and obviously approximately thirty-seven (37) weeks pregnant—approximately nine months into her pregnancy.

19.     Officer Carrico ordered Plaintiff out of the vehicle and placed her in handcuffs behind her back, despite Plaintiff's visible late-term pregnancy and the absence of any threat to officer safety.

20.     During a purported pat-down search, Officer Carrico bypassed standard pat-down protocols. Rather than patting over Plaintiff's clothing in the manner prescribed by BPD policy and constitutional standards, Officer Carrico lifted Plaintiff's sweater and rubbed her bare pregnant stomach with her hands.

21.     This invasive touching of Plaintiff's bare skin, including her exposed pregnant abdomen, exceeded the permissible scope of a *Terry* frisk and constituted an unreasonable search in violation of the Fourth Amendment.

22.     When Plaintiff expressed discomfort at this invasive touching by stating "Ew," Officer Carrico responded by calling Plaintiff "dirty" and "gross," and subsequently referred to Plaintiff as "nasty." These derogatory remarks were directed at Plaintiff, a young African American woman, in a demeaning and degrading manner.

4

23.    Officer Carrico told Plaintiff's family members present at the scene that whether Plaintiff would go to jail would depend upon her "attitude"—thereby explicitly conditioning custodial decisions on Plaintiff's exercise (or non-exercise) of her First Amendment right to free expression.

**B. First Amendment Retaliation and Reckless Transport**

24.    Officer Carrico's explicit statement that custody decisions would depend on Plaintiff's "attitude" demonstrated retaliatory intent—punishing Plaintiff for any verbal protest or expression of discomfort, and chilling Plaintiff's exercise of protected First Amendment expression.

25.    After placing Plaintiff in the rear of the patrol vehicle, Plaintiff informed Officer Carrico that she was not secured with a seatbelt. Plaintiff was handcuffed behind her back and physically unable to secure herself.

26.    Officer Carrico dismissively responded, "You're used to not wearing a seatbelt, right?" and intentionally initiated transport without securing the pregnant, handcuffed Plaintiff with a seatbelt.

27.    During transport, the patrol vehicle struck a curb or other object, causing Plaintiff—who was unsecured and unable to brace herself due to being handcuffed—to be jolted within the vehicle.

28.    Officer Carrico subsequently admitted to Internal Affairs investigators that she intentionally left Plaintiff unseat belted out of frustration with Plaintiff.

29.    Officer Carrico's deliberate failure to seatbelt Plaintiff violated BPD Policy on prisoner transport, which requires that all detainees be secured with seatbelts during transport.

30.    Transporting a handcuffed, nine-months-pregnant woman without a seatbelt, while knowing that the detainee was unable to protect herself, and after the detainee specifically requested to be secured, constitutes deliberate indifference to Plaintiff's safety and a state-created danger to both Plaintiff and her unborn child.

**C. The Booking Room Assault (Excessive Force)**

31.    Upon arriving at the Buckeye Police Department booking facility located at 100 N. Apache Road, Buckeye, Arizona 85326, at approximately 2200 hours, Plaintiff was fully compliant but moved slowly due to her late-term pregnancy and the physical constraints of being handcuffed behind her back.

32.    Plaintiff initially walked toward the computer/desk area of the booking room before Officer Carrico directed her toward the metal bench.

5

33.    As Plaintiff moved toward the bench as directed, Officer Carrico grabbed Plaintiff's left arm above the elbow and turned her body while simultaneously lifting her arm upward in a painful manner.

34.    Plaintiff verbalized her pain and discomfort by saying "ow" and began to turn her body away from the source of pain—a natural and involuntary physiological response.

35.    Rather than de-escalating, Officer Carrico maintained her grip on Plaintiff and pushed Plaintiff against the wall, pinning Plaintiff's pregnant stomach against the hard surface—creating an immediate risk of injury to both Plaintiff and her unborn child.

36.    Officer Carrico then verbally berated Plaintiff, stating: "Knock it off, do you understand me? You are here because you're an ass, knock it off!"

37.    Plaintiff moved toward the bench as if attempting to sit down and comply, but Officer Carrico pulled her back by her shirt, preventing Plaintiff from complying with the implicit instruction to sit.

38.    Officer Carrico then forcefully seated Plaintiff on the metal bench with such excessive force that Plaintiff's body bounced and rebounded upon contact with the hard metal surface.

39.    While attempting to secure Plaintiff to the bench with a restraint cuff, Officer Carrico held the restraint incorrectly. Officer Carrico then lifted Plaintiff's handcuffed arms upward and pushed her forward with her right shoulder, partially lifting Plaintiff off the bench. Plaintiff's feet briefly left the ground.

40.    As Plaintiff's arms came back down from this painful manipulation, Plaintiff reflexively grabbed Officer Carrico's left hand with her own left hand—a natural protective response to the pain being inflicted upon her.

41.    Officer Carrico verbally ordered Plaintiff to release her grip.

42.    Without allowing reasonable time for compliance, and without any objective justification, Officer Carrico removed her right hand, drew her arm back, and **struck Plaintiff on the right side of her head and face with an open hand**. Plaintiff immediately released Officer Carrico's hand following the strike.

43.    Officer Carrico then secured Plaintiff to the bench.

44.    The Buckeye Police Department's own defensive tactics expert, Sergeant Braxton Brown, conducted a comprehensive use-of-force review and concluded that the circumstances leading to Plaintiff grabbing Officer Carrico's hand were *"officer-created"* and *"self-induced,"* and that the force used by Officer Carrico was *"not objectively reasonable, was not consistent with Department training, and was not consistent with Policy 300."*

6

**D. Plaintiff's Injuries and Medical Treatment**

45.     Immediately following the assault, Plaintiff reported the strike to Officer Curtis Retrum (Badge #5888) and requested medical attention.

46.     Buckeye Fire Department responded to the booking facility and documented a contusion near Plaintiff's hairline on the right side of her head, approximately half the size of a golf ball. Emergency medical personnel also documented dangerously elevated blood pressure.

47.     Due to the severity of the head injury and elevated blood pressure, Plaintiff was transported by ambulance to Abrazo West Hospital, where she was diagnosed with a forehead contusion. Due to Plaintiff's pregnancy, X-rays and other imaging could not be performed, leaving the full extent of her injuries unknown.

48.     Plaintiff returned to the hospital the following day, November 2, 2025, due to anxiety, uncontrollable shaking, and body pain.

49.     Plaintiff subsequently documented bruising on her arms, back, and thigh, as well as a scratch on the right side of her neck, all consistent with the excessive force applied by Officer Carrico during the booking room assault.

50.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer physical injuries, severe emotional distress, anxiety, fear, humiliation, and loss of enjoyment of life.

51.     Minor Plaintiff S.S.P. was born on November 22, 2025, twenty-one days after the assault upon his mother. At birth, the Minor Plaintiff presented with symptoms including jaundice and discoloration of the lips. The full nature and extent of injuries to the Minor Plaintiff resulting from the prenatal trauma inflicted upon his mother—including but not limited to the physical assault, the dangerous transport without a seatbelt, the acute maternal stress, and the dangerously elevated blood pressure requiring emergency hospitalization—are not yet fully known and are still being evaluated by medical professionals. Plaintiffs reserve the right to supplement these allegations as additional medical information becomes available.

**E. Cover-Up and Falsification of Records**

52.     Officer Carrico intentionally omitted the strike to Plaintiff's head from her official police report, designated as DR #251101127, in an effort to conceal her use of excessive force.

53.     Officer Carrico provided false information to Sergeant Gastelum regarding the events in the booking room, deliberately concealing the fact that she struck a handcuffed, pregnant woman in the head.

54.    During the subsequent Internal Affairs investigation (IA Case No. 2025-0005), Officer Carrico provided multiple inconsistent explanations for the omission of the head strike from her report, further demonstrating consciousness of guilt.

55.    The Internal Affairs investigation formally sustained a charge of Falsification of Records against Officer Carrico, confirming that she deliberately omitted material facts from her official police report.

56.    Officer Carrico's efforts to conceal her use of excessive force demonstrate that she was aware her conduct was unlawful and unconstitutional, supporting an award of punitive damages.

**F. Prior Pattern of Misconduct and Failure to Supervise**

57.    Following the assault on Plaintiff, the City of Buckeye and BPD were made aware of Officer Carrico's use of excessive force through the citizen complaint filed on November 2, 2025, and the subsequent Internal Affairs investigation (IA Case No. 2025-0005). Despite this knowledge, the City imposed only verbal counseling and did not suspend, reassign, or restrict Officer Carrico from active patrol duty.

58.    As a direct result of the City's failure to take meaningful disciplinary action against Officer Carrico following the assault on Plaintiff, Officer Carrico remained on active patrol duty and, on January 25, 2026—less than three months after assaulting Plaintiff—**assaulted yet another arrestee**. This subsequent assault resulted in a separate criminal investigation by the Maricopa County Sheriff's Office (MCSO Case No. IR26002400).

59.    The MCSO investigation file for the Padilla case (Case No. IR26003224) specifically identified the Padilla incident as *"a second case"* involving Officer Carrico for *"allegations of assault against an arrestee,"* confirming that the Maricopa County Sheriff's Office was investigating Officer Carrico for two separate assaults on two different arrestees within a period of less than three months.

60.    On November 28, 2025, a Supervisor Inquiry (PSU2025-0016) sustained a Level 3 Performance violation against Officer Carrico relating to her role as a Field Training Officer during a possible aggravated assault investigation. The only discipline imposed was verbal counseling.

61.    On December 22, 2025, a Citizen Complaint (CC2025-0031) was sustained against Officer Carrico for discourteous conduct during a traffic stop. Once again, the only discipline imposed was verbal counseling.

62.    Sergeant Gastelum, a BPD supervisor, described an incident during a departmental briefing in which Officer Carrico engaged in a "profanity-laced" outburst "in front of the Chief." This conduct further demonstrates a pattern of aggressive and unprofessional behavior that was known to BPD command staff.

8

63.    Officer Curtis Retrum, a fellow BPD officer, described Officer Carrico's demeanor with uncooperative subjects as "direct," stating that "if somebody was being stupid... she wouldn't be shy to tell you you're being stupid." This description demonstrates that Officer Carrico's aggressive tendencies were widely known within the Department.

64.    BPD Policy 340 (Supervisor Responsibilities) establishes that supervisors commit a Level 3 violation when they "[f]ail to properly supervise members" or "[f]ail to take corrective action when warranted." Level 4 violations require officers to intervene when observing excessive force. These policies were systemically violated with respect to Officer Carrico.

65.    BPD Policy 300 requires annual review of all use-of-force incidents for patterns and training deficiencies. Upon information and belief, the City and BPD failed to conduct adequate annual reviews that would have identified Officer Carrico's propensity for excessive force.

66.    The City's pattern of imposing only minimal discipline—verbal counseling—for sustained complaints involving Officer Carrico, combined with its failure to suspend or restrict her from active duty following the assault on Plaintiff, constitutes deliberate indifference to the constitutional rights of citizens who would foreseeably come into contact with Officer Carrico. The foreseeable consequence of this inaction was realized when Officer Carrico assaulted another arrestee on January 25, 2026.

67.    Officer Carrico was hired on or about September 18, 2023, and had only approximately two years of law enforcement experience at the time of the incident. Despite her brief tenure, she had already accumulated multiple sustained complaints and a criminal investigation—a pattern that proper supervision, training, and discipline would have addressed before the assault on Plaintiff.

**G. Criminal Charges Against Officer Carrico**

68.    As a result of her assault upon Plaintiff, Officer Carrico has been criminally charged with Aggravated Assault pursuant to A.R.S. § 13-1204(A)(4) (assault upon a bound or restrained victim), under MCSO Case No. IR26003224. Officer Carrico is also the subject of a separate criminal investigation by MCSO (Case No. IR26002400) for aggravated assault upon a different arrestee on January 25, 2026.

69.    The filing of criminal charges against Officer Carrico for the assault upon Plaintiff, combined with the separate criminal investigation arising from Officer Carrico's subsequent assault upon another arrestee, further confirms the unreasonable and unlawful nature of the force used against Plaintiff and demonstrates a pattern of violent conduct.

///

///

9

## CAUSES OF ACTION

## COUNT I

## 42 U.S.C. § 1983 — EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT

*(Against Defendant Officer Carrico, Individually)*

70.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

71.     The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, prohibits the use of excessive force by law enforcement officers during an arrest, investigatory stop, or other seizure of a person.

72.     Claims of excessive force during an arrest or seizure are analyzed under the Fourth Amendment's "objective reasonableness" standard, which requires consideration of the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

73.     Plaintiff was seized within the meaning of the Fourth Amendment when Officer Carrico detained her during the traffic stop, placed her in handcuffs, transported her to the booking facility, and physically restrained her inside the booking room.

74.     Officer Carrico used excessive and objectively unreasonable force against Plaintiff by, among other things: (a) grabbing Plaintiff's arm and lifting it in a painful manner; (b) pushing Plaintiff against a wall, pinning her pregnant stomach; (c) forcefully slamming Plaintiff onto a metal bench; (d) lifting Plaintiff's cuffed arms upward and pushing her forward with her shoulder, partially lifting Plaintiff off the bench; and (e) striking Plaintiff on the right side of her head and face with an open hand.

75.     At the time Officer Carrico used this force, Plaintiff was: (a) handcuffed behind her back; (b) approximately nine months pregnant; (c) not actively resisting or posing a threat; (d) detained for a minor traffic offense; and (e) in a secured booking facility with no means of escape.

76.     No objectively reasonable officer in Officer Carrico's position would have believed that the force used was necessary or proportionate under the circumstances. The BPD's own use-of-force expert concluded that the force was "not objectively reasonable, was not consistent with Department training, and was not consistent with Policy 300."

10

77.    Officer Carrico's use of excessive force was the direct and proximate cause of Plaintiff's physical injuries, emotional distress, and other damages.

78.    Officer Carrico acted with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights, entitling Plaintiff to an award of punitive damages.

## COUNT II

### 42 U.S.C. § 1983 — MONELL LIABILITY

### (Failure to Supervise, Discipline, and Train)

*(Against Defendant City of Buckeye)*

79.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

80.    A municipality may be held liable under 42 U.S.C. § 1983 when an official policy or custom of the municipality causes a constitutional deprivation.

81.    A municipality's failure to adequately train its employees may constitute an official policy or custom where the failure reflects "deliberate indifference" to the constitutional rights of persons with whom the employees come into contact.

82.    The City of Buckeye, acting through its policymakers and supervisory officials, maintained and/or permitted the following unconstitutional policies, customs, and practices that were the moving force behind the constitutional violations inflicted upon Plaintiff:

a. A policy, custom, or practice of failing to impose meaningful discipline—beyond verbal counseling—for sustained findings of excessive force, falsification of records, and unprofessional conduct, thereby enabling officers to continue violent behavior;

b. A policy, custom, or practice of imposing inadequate and ineffective discipline—limited to verbal counseling—for sustained complaints involving aggressive and unprofessional conduct by officers;

c. A policy, custom, or practice of failing to adequately supervise officers with known patterns of aggressive behavior;

d. A policy, custom, or practice of failing to adequately train officers in the use of force against compliant, pregnant, and/or restrained detainees;

e. A policy, custom, or practice of failing to adequately train officers in proper prisoner transport procedures, including the mandatory use of seatbelts;

f. A policy, custom, or practice of failing to conduct meaningful annual reviews of use-of-force incidents to identify patterns and training deficiencies as required by BPD Policy 300;

g. A policy, custom, or practice of failing to hold supervisors accountable for failing to intervene or report excessive force as required by BPD Policy 340.

83.    The City's deliberate indifference is demonstrated by its knowledge of Officer Carrico's assault upon Plaintiff and her falsification of records, combined with its conscious decision to impose only verbal counseling and to allow Officer Carrico to remain on active patrol duty with full public contact. This decision was made by officials with final policymaking authority and reflected a deliberate choice among alternatives. The foreseeable and actual consequence of this deliberate indifference was that Officer Carrico went on to assault another arrestee on January 25, 2026—less than three months later.

84.    The need for additional training, supervision, and discipline was so obvious, and the inadequacy of existing practices so likely to result in violations of constitutional rights, that the City's policymakers can reasonably be said to have been deliberately indifferent to the need.

85.    The City's unconstitutional policies, customs, and practices were the moving force behind the constitutional violations inflicted upon Plaintiff.

## COUNT III

### 42 U.S.C. § 1983 — FIRST AMENDMENT RETALIATION

*(Against Defendant Officer Carrico, Individually)*

86.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

87.    The First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, protects individuals from government retaliation for the exercise of free speech and expression.

88.    To establish a First Amendment retaliation claim, Plaintiff must demonstrate: (1) she engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.

89.    Plaintiff engaged in constitutionally protected activity by expressing discomfort during the invasive search of her bare pregnant stomach, by verbally objecting to her treatment, and by exercising her right to free expression during her interaction with Officer Carrico.

12

90.     Officer Carrico explicitly conditioned her custodial decisions on Plaintiff's "attitude"—directly linking adverse government action (arrest and detention) to Plaintiff's verbal expression. This constitutes direct evidence of retaliatory intent.

91.     Officer Carrico's retaliatory actions included: (a) deciding to arrest and transport Plaintiff to the station rather than issuing a citation and releasing her at the scene, which was Officer Carrico's standard practice for criminal speed offenses; (b) deliberately refusing to seatbelt Plaintiff during transport as punishment for Plaintiff's verbal expressions; (c) using excessive force against Plaintiff in the booking room; and (d) verbally berating Plaintiff, stating "You are here because you're an ass."

92.     The retaliatory nature of Officer Carrico's decision to arrest and transport Plaintiff is further demonstrated by her own enforcement history. The Internal Affairs investigation established that, of approximately fifteen (15) criminal traffic stops Officer Carrico conducted since early 2024, she cited and released motorists at the scene in nearly every case—including drivers traveling at speeds of 92 miles per hour in a 55-mile-per-hour zone, 90 miles per hour in a 55-mile-per-hour zone, and 106 miles per hour in a 55-mile-per-hour zone. Plaintiff, who was traveling at 66 miles per hour in a 45-mile-per-hour zone—a materially less dangerous speed—was one of only two individuals Officer Carrico transported to the station.

93.     Sergeant Gastelum, Officer Carrico's direct supervisor, confirmed that under "normal circumstances" an officer would not transport a suspect to jail for the type of offense committed by Plaintiff. When confronted by IA investigators about whether the arrest was driven by Plaintiff's "attitude" rather than the traffic offense, Officer Carrico's repeated denials were contradicted by her own recorded statements referencing Plaintiff's "attitude" to family members as the determining factor in custody decisions.

94.     Officer Carrico also admonished Plaintiff during the traffic stop for allegedly not wearing a seatbelt. However, Plaintiff was in fact wearing her seatbelt—the lap belt was buckled, with the shoulder strap positioned behind her back to accommodate her nine-months-pregnant abdomen. Body-worn camera footage confirms that Plaintiff was wearing the seatbelt and corrected the shoulder strap upon being admonished. This false admonishment further escalated the encounter and contributed to the hostile, pretextual nature of the stop and arrest.

95.     Officer Carrico's retaliatory conduct would chill a person of ordinary firmness from exercising their First Amendment rights during encounters with law enforcement.

96.     As a direct and proximate result of Officer Carrico's retaliatory conduct, Plaintiff suffered physical injury, emotional distress, loss of liberty, and other damages.

///

13

## COUNT IV

### 42 U.S.C. § 1983 — UNREASONABLE SEARCH (FOURTH AMENDMENT)

*(Against Defendant Officer Carrico, Individually)*

97. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

98. The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures.

99. A lawful pat-down search, or *Terry* frisk, is limited to a pat-down of the outer clothing for weapons. An officer may not manipulate, lift clothing, or conduct a more invasive search absent probable cause or exigent circumstances.

100. Officer Carrico exceeded the permissible scope of any lawful pat-down by lifting Plaintiff's sweater and rubbing Plaintiff's bare pregnant stomach with her hands. This conduct went far beyond patting over Plaintiff's clothing and constituted an unreasonable and invasive search.

101. There were no exigent circumstances, no probable cause to believe Plaintiff was concealing a weapon under her sweater on her bare pregnant abdomen, and no lawful justification for this invasive search of Plaintiff's person.

102. The invasive nature of the search—touching the bare skin of a visibly pregnant woman's abdomen—was particularly egregious and violated clearly established constitutional standards governing the scope of permissible searches.

103. As a direct and proximate result of this unreasonable search, Plaintiff suffered humiliation, emotional distress, violation of bodily autonomy, and other damages.

## COUNT V

### 42 U.S.C. § 1983 — DELIBERATE INDIFFERENCE / STATE-CREATED DANGER

### (FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS)

*(Against Defendant Officer Carrico, Individually)*

104. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

14

105.    The Fourteenth Amendment's Due Process Clause protects individuals against state action that "shocks the conscience" or creates a danger to the individual through affirmative acts of state officials.

106.    Under the state-created danger doctrine, a state actor may be held liable under § 1983 when the actor's affirmative conduct places a person in peril that the person would not otherwise have faced. The Ninth Circuit recognizes this doctrine where: (1) the officer's affirmative actions created or exposed the plaintiff to an actual, particularized danger; (2) the injury was foreseeable; and (3) the officer was deliberately indifferent to the danger.

107.    Officer Carrico created and exposed Plaintiff to danger that Plaintiff would not otherwise have faced by: (a) handcuffing Plaintiff behind her back, thereby stripping Plaintiff of any ability to brace, protect herself, or protect her unborn child in the event of a collision or sudden stop; (b) deliberately refusing to secure Plaintiff with a seatbelt despite being specifically informed that Plaintiff was unrestrained; (c) admittedly doing so out of "frustration" rather than for any legitimate penological purpose; and (d) operating the patrol vehicle in a manner that caused it to strike a curb or object while Plaintiff—now rendered completely defenseless by Officer Carrico's own actions—was unsecured inside.

108.    By handcuffing Plaintiff, Officer Carrico assumed a custodial duty of care and rendered Plaintiff entirely dependent upon Officer Carrico for her physical safety during transport. Plaintiff was particularly vulnerable due to her advanced pregnancy, her restrained status (which prevented her from bracing or protecting herself or her unborn child), and her complete inability to mitigate any risk created by Officer Carrico's deliberate choices.

109.    Officer Carrico was deliberately indifferent to the known danger to both Plaintiff and her unborn child. Officer Carrico knew Plaintiff was nine months pregnant, knew Plaintiff was handcuffed and unable to secure herself, was specifically informed by Plaintiff that she was not seat belted, and nevertheless chose to drive without securing her—admittedly out of frustration.

110.    Officer Carrico's conduct in deliberately exposing a vulnerable, restrained, pregnant woman and her unborn child to the foreseeable risk of serious injury during transport shocks the conscience and violates substantive due process.

111.    As a direct and proximate result of Officer Carrico's deliberate indifference and state-created danger, Plaintiff and her unborn child were placed in imminent peril, and Plaintiff suffered physical injury, severe emotional distress, and other damages.

///

///

///

15

## COUNT VI

## 42 U.S.C. § 1983 — EQUAL PROTECTION / SELECTIVE ENFORCEMENT

## (FOURTEENTH AMENDMENT)

*(Against Defendant Officer Carrico, Individually)*

112.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

113.    The Equal Protection Clause of the Fourteenth Amendment prohibits the selective enforcement of facially neutral laws based upon impermissible considerations such as race. The constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.

114.    Though a law may be fair on its face and impartial in appearance, if it is applied and administered by public authority with an evil eye and unequal hand, so as to practically make unjust and illegal discriminations between persons in similar circumstances, the denial of equal justice is within the prohibition of the Constitution.

115.    Plaintiff is an African American woman. Officer Carrico is a White female officer. Officer Carrico selectively enforced Arizona's traffic laws against Plaintiff by arresting and transporting Plaintiff to the Buckeye Police Department booking facility for a criminal speed offense of approximately 66 miles per hour in a 45-mile-per-hour zone, while routinely citing and releasing motorists at the scene for far more serious speed violations.

116.    The Internal Affairs investigation established that, of approximately fifteen (15) criminal traffic stops Officer Carrico conducted since early 2024, she cited and released motorists at the scene in nearly every case—including drivers traveling at speeds of 92 miles per hour, 90 miles per hour, and 106 miles per hour in 55-mile-per-hour zones. Plaintiff's speed of 66 miles per hour in a 45-mile-per-hour zone was materially less dangerous than the speeds for which Officer Carrico routinely issued citations without arrest. Upon information and belief, the motorists whom Officer Carrico cited and released at the scene for these far more serious violations were not African American.

117.    Circumstantial evidence of discriminatory intent is further demonstrated by departures from Officer Carrico's normal enforcement procedures and the sequence of events during the encounter, including: (a) Officer Carrico's false admonishment that Plaintiff was not wearing a seatbelt, when body-worn camera footage confirms Plaintiff's lap belt was buckled with the shoulder strap positioned behind her back due to her advanced pregnancy; (b) Officer Carrico's decision to arrest and transport Plaintiff for a speed substantially lower than speeds for which she routinely issued citations without arrest; (c) Officer Carrico's repeated references to Plaintiff's "attitude" as the

operative factor in custody decisions; (d) Officer Carrico's degrading and demeaning comments directed at Plaintiff, including calling Plaintiff "dirty," "gross," "nasty," and "an ass"; (e) Officer Carrico's failure to run Plaintiff's driver's license before making the arrest decision; and (f) the subsequent dismissal of the reckless driving charge against Plaintiff.

118. Officer Carrico's selective enforcement of traffic laws against Plaintiff, an African American woman, under circumstances where similarly situated non-African American motorists were treated more favorably, violated Plaintiff's right to equal protection of the laws under the Fourteenth Amendment.

119. As a direct and proximate result of Officer Carrico's selective and discriminatory enforcement, Plaintiff suffered deprivation of her liberty, physical injury, severe emotional distress, humiliation, and other damages.

## COUNT VII

## ASSAULT AND BATTERY (ARIZONA STATE LAW)

*(Against Defendant Officer Carrico and Defendant City of Buckeye, on behalf of Plaintiffs)*

120. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

121. Under Arizona law, an assault occurs when a person intentionally, knowingly, or recklessly causes physical injury to another, or intentionally places another person in reasonable apprehension of imminent physical injury. A.R.S. § 13-1203.

122. Under Arizona law, a battery occurs when a person intentionally causes harmful or offensive physical contact with another person without that person's consent.

123. Officer Carrico committed assault and battery upon Plaintiff by: (a) grabbing Plaintiff's arm and lifting it in a painful manner; (b) pushing Plaintiff against a wall, pinning her pregnant abdomen; (c) forcefully slamming Plaintiff onto a metal bench; (d) lifting Plaintiff's cuffed arms and pushing her forward with her shoulder; (e) striking Plaintiff on the right side of her head/face; and (f) lifting Plaintiff's sweater and rubbing her bare pregnant stomach without consent.

124. Officer Carrico's actions constituted intentional harmful and offensive contact that was not privileged, not justified, and not reasonably necessary under the circumstances. The Department's own expert concluded that the force was not objectively reasonable.

125. Pursuant to A.R.S. § 12-820.02, a public entity is not immune from liability for the intentional or grossly negligent acts of its employees. Because Officer Carrico's assault and battery were intentional—as evidenced by the criminal charges filed under A.R.S. § 13-1204(A)(4) and the

sustained Internal Affairs findings—the City of Buckeye is liable for Plaintiffs' injuries under the doctrine of *respondeat superior.*

126.    As a direct and proximate result of Defendants' assault and battery, Plaintiff suffered physical injuries, severe emotional distress, medical expenses, and other damages. Minor Plaintiff sustained prenatal injuries as a result of the same assault and battery upon his mother, the full extent of which is not yet known and is being evaluated.

## COUNT VIII

## NEGLIGENT SUPERVISION AND RETENTION (ARIZONA STATE LAW)

*(Against Defendant City of Buckeye, on behalf of Plaintiffs)*

127.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

128.    Under Arizona law, an employer may be held liable for negligent supervision and retention where the employer knew or should have known of the employee's dangerous propensities and failed to take adequate remedial measures. See *Kuehn v. Stanley*, 208 Ariz. 124, 91 P.3d 346 (App. 2004).

129.    The City of Buckeye owed a duty to the public, including Plaintiff, to exercise reasonable care in supervising, training, and retaining its police officers and to ensure that officers with known dangerous propensities were not permitted to have unsupervised contact with the public.

130.    The City of Buckeye knew or should have known of Officer Carrico's dangerous propensities, aggressive conduct, and unfitness for unrestricted duty based upon: (a) the citizen complaint and Internal Affairs investigation arising from the assault on Plaintiff; (b) sustained findings of excessive force, falsification of records, and unprofessional conduct; (c) additional sustained complaints for aggressive and discourteous conduct; (d) documented incidents of unprofessional behavior known to command staff; and (e) her brief tenure with multiple sustained violations.

131.    Despite this knowledge, the City of Buckeye breached its duty by: (a) imposing only minimal discipline (verbal counseling) for sustained findings of excessive force and falsification of records; (b) failing to suspend or reassign Officer Carrico following the assault on Plaintiff; (c) failing to provide adequate additional training or supervision; (d) failing to restrict Officer Carrico's public contact; and (e) retaining Officer Carrico on active patrol duty with no meaningful corrective action, directly enabling Officer Carrico's subsequent assault on another arrestee on January 25, 2026.

132.    The City's negligent supervision and retention of Officer Carrico was the direct and proximate cause of the injuries inflicted upon Plaintiff and Minor Plaintiff. Had the City taken reasonable steps to supervise, discipline, or remove Officer Carrico from active duty, Plaintiffs would not have been subjected to the assault, battery, and constitutional violations described herein.

133.    The City's conduct was so far below the applicable standard of care as to constitute gross negligence, defeating any claim of immunity under A.R.S. § 12-820.02.

## COUNT IX

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ARIZONA STATE LAW)

*(Against Defendant Officer Carrico, on behalf of Plaintiffs)*

134.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

135.    Under Arizona law, a claim for intentional infliction of emotional distress requires: (1) the defendant's conduct was "extreme" and "outrageous"; (2) the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result; and (3) severe emotional distress actually occurred.

136.    Officer Carrico's conduct was extreme and outrageous, exceeding all bounds of decency tolerated in a civilized society. Specifically, Officer Carrico: (a) lifted the sweater of a handcuffed pregnant woman and touched her bare pregnant stomach while making degrading comments including calling Plaintiff "dirty," "gross," and "nasty"; (b) deliberately transported a handcuffed pregnant woman without a seatbelt out of "frustration"; (c) violently assaulted a compliant, handcuffed, nine-months-pregnant woman—including striking her in the head; (d) verbally berated and demeaned Plaintiff while using force; and (e) attempted to cover up the assault by omitting it from official reports.

137.    Officer Carrico intended to cause Plaintiff severe emotional distress, or at minimum acted with reckless disregard of the near certainty that her conduct would cause such distress. An officer who strikes a handcuffed, pregnant woman in the head and then attempts to conceal the assault necessarily knows or should know that severe emotional distress will result.

138.    As a direct and proximate result of Officer Carrico's extreme and outrageous conduct, Plaintiff has suffered and continues to suffer severe emotional distress, including but not limited to: anxiety, fear, post-traumatic stress, difficulty sleeping, uncontrollable shaking, hypervigilance, and a profound loss of trust in law enforcement. Plaintiff required emergency medical treatment the day after the incident due to the severity of her psychological symptoms. Minor Plaintiff sustained

prenatal injuries as a result of Officer Carrico's extreme and outrageous conduct upon his mother, the full extent of which is not yet known and is being evaluated.

139.    Officer Carrico's conduct was undertaken with evil motive, spite, and reckless indifference to the rights of Plaintiffs, entitling Plaintiffs to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Mackenzie Padilla, individually and as next friend of S.S.P., a minor, respectfully pray that this Court enter judgment in their favor and against Defendants, and award the following relief:

1. Compensatory damages on behalf of Plaintiff Mackenzie Padilla in an amount to be proven at trial, including but not limited to: past and future medical expenses; past and future pain and suffering; past and future emotional distress and mental anguish; loss of enjoyment of life; and lost wages and loss of earning capacity;

2. Compensatory damages on behalf of Minor Plaintiff S.S.P. in an amount to be proven at trial, including but not limited to: past and future medical expenses related to prenatal injuries; past and future pain and suffering; and such other damages as may be established through medical evaluation and discovery;

3. Punitive damages against Defendant Officer Carrico in her individual capacity, in an amount sufficient to punish her for her willful, malicious, and reckless conduct and to deter similar misconduct in the future;

4. Attorney's fees and costs of suit pursuant to 42 U.S.C. § 1988 and any other applicable statute;

5. Pre-judgment interest at the maximum rate allowed by law from the date of the incident through the date of judgment;

6. Post-judgment interest at the maximum rate allowed by law;

7. Injunctive and declaratory relief requiring the City of Buckeye to implement revised policies, procedures, additional training, and enhanced supervision protocols for the Buckeye Police Department to prevent the recurrence of excessive force and constitutional violations, including but not limited to: (i) mandatory suspension of officers following sustained findings of excessive force or upon the initiation of a criminal investigation for use of force; (ii) enhanced early-warning systems for identifying officers with patterns of aggressive conduct; and (iii) mandatory de-escalation training for all officers handling pregnant, restrained, or vulnerable detainees;

8. Such other and further relief as this Court deems just, equitable, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all claims and issues so triable in this action.

RESPECTFULLY SUBMITTED this 30th day of June, 2026.

LAW ANGELS PLLC
2162 East Williams Field Road, STE 111
Gilbert, Arizona. 85295

By: */s/ John A. Griffiths*
    John A. Griffiths
    Justin C. Johanson
        *Attorneys for Plaintiffs*